THE STATE v. CHARLES P. HARRIS, Appellant.—82 S. W. (2d) 877.

Division Two, May 7, 1935.

*E. E. Hairgrove, G. A. Stultz* and *William C. Irwin* for appellant.

*Roy McKittrick,* Attorney General, and *Franklin E. Reagan,* Assistant Attorney General, for respondents; *G. Logan Marr* of counsel.

LEEDY, J.—At the April, 1931, term of the Morgan Circuit Court, appellant was convicted of grand larceny, and his punishment was fixed at a term of two years in the penitentiary, and he appeals.

The information was in three counts, the first of which charged the larceny of two horses, one a bay mare about nine years old, and the other a brown horse about twelve years old, the goods and chattels of one Louis Paulus. The date of the alleged offense was charged to have been "on or about —— day of ————, 1930." Counts two and three, charging, respectively, larceny of farming implements and domestic fowls, were dismissed by the State at the

close of all the evidence, and the case was submitted, and conviction had under the first count.

The sufficiency of the evidence is challenged. Stated in the light most favorable to the State, its evidence was to the following effect: Louis Paulus, the alleged owner of the horses, was an elderly German. He had lived near Stover, in Morgan County, some eight or ten years, where he owned an eighty-acre farm; he came there from Nebraska, was a bachelor, and lived alone on the farm. Several physicians testified that he was suffering from senile dementia at and for a long time prior to the date of the alleged offense, as well as at the time of the trial. Numerous lay witnesses testified to a great variety of peculiarities and eccentricities of the old gentleman, and that he was not of sound mind. It was shown that in the latter part of June, 1930, he removed from Morgan County, and returned to Nebraska to live. On the day of his departure he was in company with appellant, Harris, and there was some evidence that appellant accompanied Paulus when the latter left. Harris seems to have returned immediately. On the day just mentioned, appellant went to a bank at Stover, and sought to cash, or obtain the proceeds of a certificate of deposit for about one thousand dollars owned by Paulus, but the bank declined to pay in the absence of Paulus. Later in the day, appellant returned to the bank accompanied by Paulus, and an attorney. As a result of negotiations had at that time, the bank's draft for nine hundred and seventy-nine dollars (which represented the value of the certificate of deposit, less twenty-five or fifty dollars paid in cash, and less, also, the amount of a note owed by Paulus to the bank) was delivered either to Paulus or appellant. In due time the draft cleared. It was introduced in evidence, bearing the indorsement of Paulus, the payee, and what purported to be the indorsement of appellant, although the banker said he could not identify appellant's signature.

The record is in a state of confusion as to what disposition, if any, was made of the farm and the livestock and other personal property thereon at the time Paulus returned to Nebraska. From his own testimony it appeared that Paulus was still the owner of the farm at the time of the trial. If he leased or rented it, it is not shown to whom, or under what arrangement. On the other hand, there is testimony tending to show he had disposed of the place, but this is not at all clear. He disposed of a farm at the time he returned to Nebraska, but from the scant reference thereto in the testimony, it seems that it was a Nebraska farm that was sold. In any event, shortly after Paulus left, appellant was seen on, and apparently in charge of the Paulus place. Henry Tambke, a neighboring farmer, in response to a question as to what appellant was doing there, testified "He was taking care of the stock for one thing—watering the horses,

and then some cleaning up there." This witness referred to appellant's having "taken" the premises in the early spring of 1930, and that thereafter appellant told the witness he was trying to sell the place; that Paulus wanted him to do so. H. F. Lemke testified he went to the Paulus farm on Sunday after Paulus left; that "Charles Harris (appellant) and I went over to look at them (the horses). He wanted to sell them to me. He priced them—first he priced the horses, and then said what he would take for the mare—he said he wanted the horses." He further testified to a conversation with Harris in which appellant "said he went over to see those horses, and he found them pretty near starved and he had to pump water about two hours." He quoted appellant as saying at that time, "I ain't afraid of that crazy man." He said Harris told him that he (Harris) was the owner of the horses.

Anton Ehlers testified that on November 20, 1930, he bought the mare from Harris paying twenty-five dollars for it and that he "thought" the mare came from Mr. Paulus. On cross-examination he testified, "I asked if there was anything against the horse, and he (Harris) said he had a bill of sale for it." Dave Gehrs testified for the State that about the first of November, 1930, he purchased the tools and implements on the Paulus place from appellant, and rented the house on said farm from appellant. He moved thereto the last of October or first of November, 1930, and resided there until the following March; that while he was so renting the Paulus farm there were two horses there—a bay mare nine or ten years old, and a brown horse about twelve years old, and that appellant claimed ownership of them; that the horses left the place while witness resided thereon, and that "Mr. Harris got them." That he got one of them in November, 1930, and the other three or four weeks later; that appellant claimed he got "the property" as a commission on the sale of the farm.

Louis Paulus was called as a witness on the part of the State. Defendant interposed an objection to his testifying on the ground he was incompetent because under the State's own evidence he was shown to be insane. The court in the absence of the jury, conducted a preliminary examination of the witness touching his competency, and from the answers elicited thereby, permitted him to testify. To such action and ruling of the court no exception was saved, nor was the objection renewed. While his examination on the merits was somewhat rambling, in substance, he testified he put the farm in grass "and turned them (the horses) out because I was tied up in Nebraska." When asked by the prosecuting attorney, "Have you still got two horses on your farm in Morgan County?" the witness replied, "I turned them horses out, but I don't know whether they lived, or not—I was going to look and see if they were there yet."

The only other question asked the witness relating to the horses, or the claim of ownership made by Harris to them was as follows: "Did you give Charles P. Harris a bill of sale to these two horses? A. No, sir, I never did." He denied that he knew Harris, or that he had ever seen him. It was developed that a fund had been raised for the purpose of employing a special prosecutor in the case, to which fund several of the State's witnesses admitted they had subscribed. The complaint was not made by Paulus, but by the sheriff of the county.

Appellant did not testify, but on his behalf there was introduced a bill of sale dated June 27, 1930, purporting to have been signed by Paulus conveying to one Ora B. Jones, the livestock and other personal property on the Paulus farm, as well as growing crops thereon. Mr. A. J. Bolinger a licensed attorney residing at Versailles, who also maintained an office at Stover, was called on behalf of appellant. He testified that at the instance of Paulus he went to the Farmers' Bank at Stover in company with Paulus, and that during the course of the negotiations with respect to the certificate of deposit hereinabove referred to, Mr. Vickery, the banker, and Paulus had a conversation, the substance and effect of which was as follows: "Q. Did Mr. Vickery, in your presence talk with Mr. Paulus concerning his farm? A. Yes, he asked where he was going. Q. What did he say? A. He said, he was going back to Nebraska. Q. What else, if anything was said? A. He asked what he was going to do with the stuff on the place and Mr. Paulus said, 'the man that got the place, got the stuff,'—that is about the extent of the conversation."

This conversation was not denied by either of the alleged participants. No evidence in rebuttal was offered.

█ The transcript of the record, as filed by appellant, consists of five separate documents, each lodged in this court at a different time. As stated, the trial was held at the April, 1931, term. The verdict was returned April 30, 1931, and on the same date a motion captioned "motion for new trial and in arrest of judgment" was filed. And at the September, 1931, term the aforesaid motion was overruled, defendant excepting, and an affidavit for an appeal was filed, and an appeal allowed to this court. Thereafter, and on December 17, 1931, there was filed in this court, certified under the hand and seal of the circuit clerk, as "a true transcript of the record of the proceedings herein as fully as the same appear of record in this office." This purported transcript wholly failed to show judgment and sentence. Thereafter, at the April, 1932, Term of the Morgan Circuit Court, and during the pendency of the appeal, the prosecuting attorney of said county filed in said court, in said cause, a motion for a *nunc pro tunc* entry, to correct the record of the April, 1931, term so as to show the dismissal of the second and third counts of the

information at the close of the whole case. Such motion came on for hearing, and the State and defendant appearing, the motion was sustained, and an entry correcting the record in the particular mentioned, was made. It may be said that on the hearing there was introduced in evidence an instruction, given by the court at the trial on the merits, which told the jury that such counts had been dismissed. This was manifestly such a minute or record as would authorize the making of a *nunc pro tunc* entry. Thereafter, and on April 28, 1932, nearly a year after the return of the verdict, the defendant was brought into court, accorded allocution, and judgment rendered, and sentence imposed in accordance with the verdict. Thereafter, the defendant filed a second motion for a new trial, which, upon being overruled, was followed by an affidavit for an appeal, and the allowance thereof. Thereafter, on March 25, 1933, appellant filed in this court a certified copy of his second motion for new trial and in arrest of judgment, together with certified copies of his affidavit for leave to prosecute his appeal as a poor person, and affidavit for an appeal. On June 9, 1932, another purported transcript of the record was filed in this court, which supplied the deficiency mentioned in the first one, and also showed the dismissal of the two counts mentioned, as corrected by *nunc pro tunc* entry.

The general bill of exceptions (approved by the trial court November 28, 1933)—whether it is the original or a copy we are unable to determine from an examination of the clerk's certificate—was filed in this court November 29, 1933. And on December 2, 1933, there was filed in this court a second or supplementary bill of exceptions, approved by the trial court December 1, 1933 (which likewise fails to disclose whether it is a copy or the original), showing the proceedings had with respect to the *nunc pro tunc* entry hearing, and the so-called second motion for new trial and in arrest, the overruling of the latter, and the allowance of a second appeal.

█ I. It is the position of the learned Attorney General that the only matter before the court for review in this case is the record proper. This contention grows out of the fact that, as recited above, appellant filed a second motion for new trial, but which, it will be observed, came after allocution, judgment and sentence. It is argued that the filing of the second motion operated, *ipso facto*, as a waiver and abandonment of the former and timely filed motion, and the grounds therein alleged. To this we do not agree. The second motion for new trial not having been "filed before judgment and within four days after the return of the verdict" nor upon an extension of time, not exceeding ten days from the date of the return of the verdict (Sec. 3735, R. S. 1929, sec. 3735, 4 Mo. Stat. Ann., p. 3275) came too late. The trial court would not have been authorized in con-

sidering it, nor would this court on appeal. Being a nullity, no waiver or abandonment of the former motion should, under the circumstances of this case, be implied or enforced.

■ II. The motion for new trial which we are considering, the first, assigns as error the refusal of defendant's demurrer at the close of the whole case. We have set out the evidence in the case at length, and from it, we are constrained to hold appellant's position is well taken. On the facts, the case is unique. The offense of larceny always involves a trespass—a taking against the will of the owner. As supplying that element, the State here relies upon the incapacity, because of impaired mental faculties, of Paulus to consent to the taking. But consent was not asserted as a defense, and the State, as a part of its case in chief, sought to establish the unsound mental condition of Paulus, and appellant's knowledge thereof, and instructed the jury in that regard as follows:

"The court instructs the jury that if you believe (beyond a reasonable doubt) that Paulus was in such a mental state at the time the defendant took possession of said property, if you find he did take possession thereof, that he was unable to comprehend the value of property and to know he was attempting to part with the same and that the defendant knew of the said mental condition of said Paulus when the defendant took possession of the property of said Paulus, if you find said defendant took possession of said property of said Paulus in the manner defined in other instructions, then the consent, if you find there was consent, of said Paulus is no defense."

This instruction predicates the alleged larceny as of the date the appellant came into possession of the horses, which was shown to have been in June when Paulus returned to Nebraska to live. In passing, it may be said that the sole objection urged to this instruction is that it failed to require the jury to make the finding hypothesized "from the evidence." The objection is frivolous, when viewed in the light of all the instructions. It is set out herein for the purpose of showing the State's theory, and that alone. There was no direct evidence respecting any transaction between Paulus and appellant touching the horses in controversy, or the farm on which Paulus said he turned them out to grass. The court gave an instruction on the law of circumstantial evidence.

As to the propriety of overruling the demurrer offered at the close of the whole case, it is stated in respondent's brief, as follows:

"Paulus testified that he never sold the horses in question to the appellant (120). The evidence is ample to show that within a few days after Paulus had disappeared from his farm, appellant was in charge of the farm, including the horses in question (48); that appellant took the two horses away from the Paulus farm (87) and claimed to be the owner of the horses (79), and sold one of the horses.

"These facts are sufficient to show that immediately after the disappearance of Paulus, and the theft of his property, the appellant was in the exclusive possession of the two horses in question. This was a circumstance which the jury had the right to pass upon, and having been passed upon by the jury, and the jury having found the appellant to be a horse thief, the demurrer was properly overruled." (Numerals refer to the paging of the bill of exceptions.)

Our search of the record fails to disclose the first statement quoted above form respondent's brief, ascribing to the witness Paulus testimony that "he never sold the horses in question to appellant." On the contrary, the record, at page 120, to which our attention was especially invited, merely shows that Paulus said he did not give appellant a bill of sale to the horses. The record is devoid of any direct evidence as to the vital fact of ownership. Paulus was not asked the question, nor, indeed, whether he had ever sold them to appellant, or anyone else. It cannot be contended that a bill of sale is necessary to convey the title to personal property, such as horses, and we cannot construe the bald statement of Paulus that he had never given Harris a bill of sale to the horses as the equivalent of testimony that he was the owner thereof at the time of the alleged offense. Particularly is this true in view of his statement that he had turned them out, which might have been construed as an abandonment of them. The other excerpts are correctly set out, but we think they fall considerably short of establishing a submissible case under a charge of larceny.

Upon examination by the court, Paulus was found to be a competent witness, and he took the stand. It is, perhaps, significant that neither he nor the banker in whose presence the statement was alleged to have been made, contradicted the evidence of the witness Bolinger that Paulus said: "The man that got the place got the stuff." And so, for aught that appears in the record, either directly or by fair inference, appellant's possession of the Paulus farm was lawful. The horses were on said farm at the time he took possession, having been "turned out" by Paulus. His possession of the farm and horses being lawful, he could not be convicted of larceny upon a mere claim of ownership of the property. Had the State relied upon the wrongful conversion of the horses as of the time they were removed from the farm, still the conviction could not be upheld, and this because the State's own evidence showed, and it was undisputed, that the sale of the mare to Ehlers, and its consequent removal occurred on November 20, 1930, and that the other horse was taken away three or four weeks thereafter. Therefore, such conversions, if larcenous, constituted separate and distinct offenses.

For the reasons assigned, the judgment is reversed, and the cause remanded. All concur.