STATE v. OLIN LANE, Appellant.—No. 40008.—200 S. W. (2d) 72.

Division Two, March 10, 1947.

*Byron Kearby* for appellant.

*J. E. Taylor*, Attorney General, and *Richard F. Thompson*, Assistant Attorney General, for respondent.

LEEDY, J.—Appellant and two women, Lillian Inman and Alice Akes, were charged by information in the Circuit Court of Butler County with grand larceny, in having, on or about Feb. 8, 1945, stolen $900.00 in money from Sanford Mills. The cause was continued from term to term until May 3, 1946, when the state dismissed the case as to the women, and Lane was placed upon his trial. The jury returned a verdict of guilty, assessed his punishment at imprisonment in the penitentiary for a term of two years, with the recommendation that he be paroled. The court, declining to follow this recommendation, sentenced defendant to the imprisonment specified in the verdict, and he appeals.

The principal question is whether the court erred in failing to direct a verdict of not guilty, as requested by defendant. Mills, who had filed the complaint, did not testify, but the state called the two women as witnesses, and relied on their testimony to establish the main facts of the case. From their testimony it appears that Mills (who was usually referred to by them as "the old gentleman", or "the old man"—his age was fixed by one as "around sixty") was a

stranger to them, and in the community; that they were seated in a tavern in Poplar Bluff on the night in question, as members of a group which, in addition to themselves, consisted of the defendant, and another man and woman; that Mills came into the tavern, and although a total stranger, "just bumped into" the group, bought a round or so of drinks, and attached himself to the party. It was then about closing time for the tavern, and defendant suggested that they "go and dance somewhere, and have some drinks"; a cab was called, and the six persons got in; they stopped at a liquor store where a quart or a fifth of whiskey was purchased, after which the other man and woman were taken to a certain address, and discharged as passengers, and the cab proceeded to a cabin on Highway 67, with Lillian and defendant riding in the front seat with the driver, and Alice and Mills in the back seat.

Enroute the "old man said something about shooting craps" or "being a crap shooter", and defendant said, "Well, I shoot craps, too, so we will have a crap game." The cabin was across the road from a place known as "Hill Top" or "Hillcrest". Reaching the cabin, the men drank some of the whiskey, and engaged in a crap game, and consumed more during the course of the game. The women were in the same room, but did not take part in the game. They testified that first one would roll the dice, then the other—they shot some on the bed, and some on the floor, on their knees, and the bets, or money changed hands. They did not undertake to say how much, but they saw bills of different denominations, 5's, 10's, and 20's— five or six of them. Finally, defendant won all the money, and "the old man got kind of sore, I guess. He said it wasn't fair, or he had cheated, or something." Lillian's version was that the old man then went into the front room for a moment, and defendant went in there, too—the door remained open. They did not stay in there; he came right back out, and then went out the side door grumbling, and or saying he had been cheated, and that is the last they saw of him. Both women denied they got any part of the old man's money. Alice testified similarly, but she alone was asked specifically if she had seen "Olin rob this fellow, take any money off of him," to which she replied, "No, sir," but related that defendant won some money in the crap game; that Mills did not say "anything about being robbed, or anything like that," but that "he sorta got peeved before he left and went out . . . he was grumbling about not being fair or something to that effect, or he didn't like it, the way things were going." This witness did not remember the old man going into the front room, but said he might have done so while she was in the rest room.

They were at the cabin perhaps an hour and a half, and after Mills left, and as soon as they could get a taxi, they returned to a restaurant in town where defendant made the statement to the women

to the effect that "if anything come up, or anything, I won this money gambling." Mills filed his complaint against the defendant and the women on February 9, on which day defendant was arrested. When questioned by the arresting officers, defendant first denied having been at the cabin, but after being "confronted with the evidence he admitted that he went out to the cabin and gambled with this fellow Mills." A search of his person revealed he had about $60.00 in currency, including one $20.00 bill, and others of smaller denominations. Under questioning by the officers, he stated he had won between fifty and one hundred dollars from Mills in the crap game. He also admitted buying the whiskey and paying for the cabin. As accounting for the failure of Mills to testify, it was shown by the sheriff that he had not seen Mills since the preliminary, but had tried, without success, to locate him in Indiana; and in that connection he testified Mills had a son "who lives down here by the Lone Star church."

Testifying in his own behalf, defendant admitted shooting craps with Mills, and said he won between 50 and 100 dollars. He further testified that Mills had suggested the crap game, and that each of them had his own dice. He denied that he had taken any money off the person of Mills, or had stolen any of his money, and he had not heard Mills express any dissatisfaction about the game, except he couldn't win. On cross-examination he admitted having paid a fine for gambling within the last year.

In his brief, the Attorney General, with commendable frankness, concedes that upon a reading of the record the theory upon which the defendant was found guilty is not entirely clear, and with this conclusion we are in accord. A circumstantial evidence instruction was given (over defendant's objection), and among other things, it told the jury, "The state in this case seeks to convict the defendant of the crime charged on circumstantial evidence; that is, there is no evidence by any witness that saw the offense charged in the information committed." In any view that may be taken of the proof we are unable to discover therein the essential elements of the crime of larceny. The element of trespass is expressly negatived. It is hornbook law that larceny always involves a trespass; a taking against the will of the owner. State v. Harris, 336 Mo. 1134, 82 S. W. 2d 877. "It is not larceny when the owner, in delivering the possession, intends also, at the same time, to confer the right of property, for any reason which he considers sufficient at the time. Where the right of property has once vested with the consent of the owner, there is evidently no unlawful taking of any kind." Kelley's Criminal Law and Procedure, 3d Ed., sec. 654, p. 614. See, also, State v. Anglin (Mo.), 222 S. W. 776 (prosecuting witness matching coins with strangers, betting on the result); State v. Buck, 186 Mo. 15, 84 S. W. 951. Moreover, the rule is that "One who ob-

tains the chattel or money of another by means of a game of chance, however fraudulently operated, is not guilty of larceny if the owner of the property, believing himself to have lost the wager, voluntarily pays or consents to the payment or delivery of the stakes to the supposed winner, for in such a case the title to the money passed notwithstanding the fraud by which the transfer was induced.'' 36 C. J. sec. 147, p. 779.

It was probably on the theory that the element of trespass might be regarded as supplied through the admittedly intoxicated condition of Mills that the court gave an instruction which told the jury that if they believed and found from the evidence ''that Sanford Mills lost his money shooting craps with the defendant, and that Mills while shooting craps was sober enough to know and realize what he was doing, then you will find the defendant not guilty.'' But there was not sufficient evidence upon which to base this instruction, even if the missing element could be so supplied—a question on which we find it unnecessary to express an opinion. ''There are degrees of intoxication varying all the way from slight stimulation to complete coma, and it is only at some point along the line between the two extremes that the loss of control of the mental faculties occurs.'' 48 C. J. S. 122. Our attention has not been directed to any holding that where a person in a ''pretty tight'' condition (one commonly, if not universally associated with the play of the game of craps) loses his money at the game, that, as applied to the winner, the misdemeanor of gambling is thereby raised to the felony of grand larceny, if the loser's stake is $30.00, or upwards. In this connection, the idea suggests itself that there may be warrant for the belief entertained in some quarters that the ''tightest'' crapshooter in a game is not infrequently the ''hottest.'' But in any event, the proof on the question of intoxication was wholly insufficient to show that Mills was disabled from voluntarily participating in the game, and consenting to the delivery of the stakes. The judgment must, therefore, be reversed. We remand it only because of the possibility that upon retrial Mills may be available as a witness, and his testimony may put a different light on the state's proof. Reversed and remanded. All concur.